NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**HIGH POINT SARL,**

*Plaintiff-Appellant*

**v.**

**T-MOBILE USA, INC., ERICSSON, INC., NOKIA SOLUTIONS AND NETWORKS US LLC,**

*Defendants-Appellees*

---

2015-1235

---

Appeal from the United States District Court for the District of New Jersey in No. 1:12-cv-01453-JEI-AMD, Judge Joseph E. Irenas.

---

Decided: February 18, 2016

---

MARTIN J. BLACK, Dechert LLP, Philadelphia, PA, argued for plaintiff-appellant. Also represented by DEREK J. BRADER; ROBERT RHOAD, Princeton, NJ.

ASIM BHANSALI, Keker & Van Nest, LLP, San Francisco, CA, argued for defendant-appellee T-Mobile USA, Inc. Also represented by DAN L. BAGATELL, Perkins Coie LLP, Phoenix, AZ; RYAN J. MCBRAYER, CHRISTINA JORDAN MCCULLOUGH, Seattle, WA.

WILLIAM L. MENTLIK, Lerner, David, Littenberg, Krumholz & Mentlik LLP, Westfield, NJ, argued for defendant-appellee Ericsson, Inc. Also represented by JONATHAN A. DAVID, ROBERT BENJAMIN HANDER, ROY HENRY WEPNER.

ADAM CONRAD, King & Spalding LLP, Charlotte, NC, argued for defendant-appellee Nokia Solutions and Networks US LLC. Also represented by DARYL JOSEFFER, Washington, DC; ALLISON H. ALTERSOHN, CHRISTOPHER CARNAVAL, ROBERT FRANCIS PERRY, New York, NY.

———————

Before REYNA, MAYER, and CHEN, *Circuit Judges.*

PER CURIAM.

High Point SARL ("High Point") appeals the final judgment of the United States District Court for the District of New Jersey holding that its patent rights were exhausted by the authorized sales of telecommunications infrastructure equipment substantially embodying the asserted claims of U.S. Patent Nos. 5,195,090 (the "'090 patent"), 5,195,091 (the "'091 patent"), 5,305,308 (the "'308 patent"), and 5,184,347 (the "'347 patent"). *See High Point SARL v. T-Mobile USA, Inc.*, 53 F. Supp. 3d 797 (D.N.J. 2014) ("*District Court Decision*"). We affirm.

## I. BACKGROUND

### A. The Asserted Patents

The asserted patents relate to the transmission of packetized cellular telephone traffic within the terrestrial portion of a wireless telecommunications system. These patents were originally owned by AT&T Corp. ("AT&T"), but AT&T assigned them to its spin-off company, Lucent Technologies Inc. ("Lucent") in 1996. *See id.* at 800. Avaya Technology Corporation ("Avaya") acquired the asserted patents from Lucent in 2000. High Point, a

Luxembourg-based entity, purchased these patents from Avaya in 2008. *Id.* at 800 n.1. At issue in this appeal is the scope of a series of licenses and sublicenses to make and sell products practicing the claimed technology.

B. The Alcatel Cross-License

In 1996, AT&T granted a nonexclusive license to a portfolio of patents—including the asserted patents—to Alcatel Alsthom Compagnie Generale d'Electricite S.A. ("Alcatel"). Joint Appendix ("J.A.") 5394–5405. The license agreement automatically extended sublicenses to current and future subsidiaries of both AT&T and Alcatel. J.A. 5396; *see District Court Decision*, 53 F. Supp. 3d at 801. The agreement only extended, however, to "products and services of the kinds which [were] furnished or used" by AT&T and Alcatel, or their related companies, on the effective date of the agreement. J.A. 5395.

In 2006, following a reverse triangular merger, Lucent and Alcatel combined to form Alcatel-Lucent, S.A. ("Alcatel-Lucent"). Alcatel USA Marketing Inc. ("Alcatel Marketing") was a subsidiary of Alcatel. *See District Court Decision*, 53 F. Supp. 3d at 801. In 2008, Alcatel Marketing merged with an Alcatel-Lucent subsidiary to form Alcatel-Lucent USA Inc. ("Alcatel U.S.").

C. The Siemens Cross-License

In 1988, AT&T entered into a non-exclusive patent cross-licensing agreement with Siemens AG ("Siemens"). In 1995, AT&T announced that it was planning to undergo a major corporate restructuring and that it would split its business into three separate legal entities. J.A. 4881. AT&T wanted to ensure that these three new entities—and those entities' own future divested businesses—would have the same licenses and rights that AT&T itself possessed under its 1988 cross-license with Siemens. J.A. 4881. AT&T was willing to grant reciprocal rights to any future businesses divested by Siemens. J.A. 4881. Ac-

cordingly, in November 1995 AT&T and Siemens executed a divestment rider which provided that:

> [I]n the future, if [Siemens] or any of the three [AT&T divested] entities divest[] a portion of its present business, the licenses and rights granted in the [1988 cross-license between Siemens and AT&T] may be sublicensed to the divested business by the divesting company. Such sublicenses may be granted and retained only while the future divested business operates as a separately identifiable business and only to the extent applicable to products and services sold by the future divested business prior to its divestiture. J.A. 4881.

On April 1, 2007, Siemens divested its carrier division and formed a new joint venture entity, Nokia Siemens Networks B.V., with a networks business divested from Nokia Inc. ("Nokia"). J.A. 6231–33. Nokia Siemens Networks B.V. "was a distinct operational group with its own board of directors, governance, and organization." J.A. 6235. In 2009, Siemens granted Nokia Siemens Networks B.V. a sublicense in the asserted patents. J.A. 5305–11. This sublicense was made retroactive to April 1, 2007. J.A. 5308. In 2011, Nokia Siemens Networks B.V. granted a retroactive sublicense in the asserted patents to its U.S. subsidiary, Nokia Siemens Networks US LLC ("Nokia Siemens Networks U.S.").[1] J.A. 5356–59.

D. The LM Ericsson Cross-License

In 1996, Lucent entered into a cross-licensing agreement with Telefonaktiebolaget LM Ericsson ("LM Ericsson"). That agreement, which covered the asserted patents, afforded LM Ericsson the right to grant subli-

---

[1] In August 2013, Nokia Siemens Networks U.S. changed its name to Nokia Solutions and Networks US LLC. J.A. 1096.

censes to its subsidiaries and other "related companies." J.A. 1781. It also specifically provided that such sublicenses could "be made effective retroactively." J.A. 1781.

In January 2013, LM Ericsson granted its U.S. subsidiary, Ericsson Inc. ("Ericsson U.S."), a *nunc pro tunc* sublicense to the patents-in-suit. This sublicense was made retroactive to January 1, 2002.

E. The District Court Litigation

On March 8, 2012, High Point filed an infringement suit against T-Mobile USA, Inc. ("T-Mobile"), a wireless network communications services provider. According to High Point, T-Mobile used transmission technology disclosed in the '090, '091, '308, and '347 patents to transfer voice packets within its network. In response, T-Mobile sought declaratory judgments that High Point's patents were invalid and not infringed. J.A. 880–92. In May 2013, the district court permitted Nokia Siemens Networks U.S. and Ericsson U.S., two of T-Mobile's suppliers, to intervene in the suit as defendants. J.A. 451–56.

Before the district court, High Point asserted that T-Mobile's assembly and use of its third generation cellular wireless network (the "3G network") infringed claims of each of the asserted patents. High Point's infringement contentions focused on three principal pieces of equipment in T-Mobile's 3G network: (1) the Node B (sometimes referred to as a "radio base station"); (2) the radio network controller ("RNC"); and (3) the media gateway ("MGW"). As High Point explains, Node Bs "are used to convey digital traffic 'over the air' to and from mobile users in a geographic area near the Node B." Br. of Plaintiff-Appellant at 12; *see* J.A. 6298. Each Node B communicates with—and is connected to—an RNC via transmission media and interconnect equipment. J.A. 6298. An RNC controls and processes voice traffic sent to and received from the Node Bs. J.A. 6298, 7125–26. MGWs connect the cellular voice network to the conventional

Public Switched Telephone Network. J.A. 6074, 6296–98. MGWs typically communicate with multiple Node Bs through one or more RNCs. J.A. 2734–35, 6074.

T-Mobile purchased MGWs from Alcatel U.S. and its predecessor, Alcatel Marketing (collectively "Alcatel Marketing U.S."). It purchased Node Bs and RNCs from Nokia Siemens Networks U.S., and Node Bs, RNCs, and MGWs from Ericsson U.S. *See District Court Decision*, 53 F. Supp. 3d at 805 n.10.

In February 2014, T-Mobile and Nokia Siemens Networks U.S. filed a combined motion for summary judgment, arguing that "High Point's patent rights [were] exhausted by the sale of licensed articles that substantially embod[ied] the asserted claims of High Point's asserted patents." J.A. 2721. Ericsson U.S. filed a separate summary judgment motion in which it contended that its sales of equipment to T-Mobile were fully authorized by the sublicense it obtained from LM Ericsson. J.A. 1178–98. Ericsson U.S. further contended that any infringement claim against T-Mobile based on T-Mobile's use of equipment supplied by Ericsson U.S. was barred by exhaustion. J.A. 1212.

On October 15, 2014, the district court granted both summary judgment motions. In the court's view, the doctrine of patent exhaustion barred all of High Point's infringement claims because the accused products were sold under valid licenses and sublicenses. *See District Court Decision*, 53 F. Supp. 3d at 810. The court rejected High Point's argument that the 1996 cross-licensing agreement between AT&T and Alcatel did not extend to Alcatel Marketing U.S. *Id.* at 807. It further held that the MGWs Alcatel Marketing U.S. sold to T-Mobile were licensed products, explaining that MGWs were the same "kind" of product that Alcatel sold at the time of its 1996 cross-licensing agreement with AT&T. *Id.* at 807.

The trial court also concluded that the sales of equipment by Nokia Siemens Networks U.S. to T-Mobile were authorized by the divestment rider which AT&T and Siemens executed in November 1995. *Id.* at 808. Although High Point argued that no license rights could be conveyed to Nokia Siemens Networks B.V., the parent company of Nokia Siemens Networks U.S., because it never operated as a "separately identifiable business," the court rejected this contention, stating that "[t]he plain language of the [1995 divestment] rider indicates that [a] divested business need only operate separately *from Siemens.*" *Id.* The court likewise found no merit in High Point's assertion that the 1988 cross-licensing agreement between AT&T and Siemens only authorized the sale of the particular product models that Siemens had sold prior to the time it divested its carrier division. *Id.* at 808 n.13.

In addition, the district court held that Ericsson U.S. had sold equipment to T-Mobile under a valid sublicense from LM Ericsson. *Id.* at 804–05. In the court's view, the 1996 cross-licensing agreement between Lucent and LM Ericsson placed no time limits on when sublicenses could be granted. *Id.* at 805. Finally, the district court held that licensed equipment sold by T-Mobile's suppliers substantially embodied all of the asserted claims. *Id.* at 809–10. The court rejected High Point's argument that "exhaustion only applies if each 'individual component' of T-Mobile's accused network substantially embodie[d] each patent claim at issue," concluding that such an approach "would severely undercut, if not eviscerate, the doctrine of patent exhaustion." *Id.* at 810.

After the parties stipulated to the entry of final judgment, J.A. 36, High Point filed a timely appeal with this court. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

II. DISCUSSION

A. The Patent Exhaustion Doctrine

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). Exhaustion is a judicial construct grounded on "the theory that an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of that item thereafter because the patentee has bargained for and received full value for the goods." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013); *see Adams v. Burke*, 84 U.S. (17 Wall.) 453, 455 (1873) ("We have repeatedly held that where a person had purchased a patented machine of the patentee or his assignee, this purchase carried with it the right to the use of that machine so long as it was capable of use."). It can be invoked as an affirmative defense to an infringement claim, "and like other issues in which there are no disputed factual questions, may be properly decided by summary judgment." *Keurig*, 732 F.3d at 1373.

On appeal, High Point challenges the district court's exhaustion determination on several fronts. It asserts that sales of the accused infrastructure equipment were unauthorized because: (1) the MGWs T-Mobile purchased from Alcatel Marketing U.S. were not licensed because they were not the same "kind" of product that Alcatel sold when it entered into its 1996 cross-licensing agreement with AT&T; (2) the Node Bs and RNCs T-Mobile purchased from Nokia Siemens Networks U.S. were not licensed products because the carrier division that Siemens divested in 2007 did not remain a "separately identifiable business"; and (3) LM Ericsson could not convey a retroactive sublicense to Ericsson U.S. because its right to grant sublicenses expired in 2011. High Point further contends that exhaustion does not apply because

the articles sold under the purported licenses and sublicenses did not "substantially embody each and every invention claimed in the patents-in-suit." Br. of Plaintiff-Appellant at 44. We address each of these arguments in turn.

B. Sales by Alcatel U.S.

The 1996 cross-licensing agreement between AT&T and Alcatel covered "any or all products and services of the kinds" which the parties used or sold on the effective date of the agreement. J.A. 5395. In High Point's view, the MGWs sold by Alcatel Marketing U.S. to T-Mobile were not licensed products because Alcatel was not "in the business of selling MGWs in January 1996." Br. of Plaintiff-Appellant at 41. In support, it argues that the MGWs Alcatel Marketing U.S. sold to T-Mobile were not original Alcatel products, but were instead manufactured by Spatial Communications Technologies Inc., a company acquired by Alcatel in 2004.

We do not find this argument convincing. The cross-licensing agreement between AT&T and Alcatel speaks in exceptionally broad terms, covering "any or all products . . . of the kinds" sold by Alcatel in 1996. J.A. 5395. There is no dispute that Alcatel sold switching systems in 1996. Its 1996 Annual Report stated that it manufactured and marketed "complete telecommunications systems," and that its global business included "public switching networks" and "mobile communications infrastructure." J.A. 5433. That report further noted that Alcatel manufactured "switching systems" compliant with worldwide technical standards as well as with both current and emerging U.S. technical standards. J.A. 5428. Because Alcatel indisputably sold switching systems in 1996 and MGWs are integral switching system components, they are products "of the kind[]" that Alcatel sold on the effec-

tive date of its cross-licensing agreement with AT&T.[2] *See District Court Decision*, 53 F. Supp. 3d at 807 ("High Point does not dispute that Alcatel sold 'switching systems' in 1996, and that MGWs are a type of switching system."). Indeed, before the district court High Point argued that the accused MGWs met switching system limitations in the patents-in-suit. *See, e.g.*, J.A. 6310.

In *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1338 (Fed. Cir. 2011), we construed a licensing provision very similar to the one at issue here. There the license in question extended to "products and services sold by [a] future divested business prior to its divestiture," and the patent holder argued that this language covered only the specific product models that were sold by the divested business before it was divested. *Id.* at 1338 (citations and internal quotation marks omitted). We rejected this argument, however, concluding that because the licensing agreement "specif[ied] product types using general, functional terms," it was not limited to the particular products sold at the time of the divestiture. *Id.* We explained that the term "products" covered "modems generally, not specifically the exact types of modems in production at the time of the . . . divestiture." *Id.* (citations and internal quotation marks omitted).

Here, the language of the licensing provision is even broader—covering not only "products and services," *id.*, but "any or all products and services *of the kinds*" sold on

---

[2]  In its infringement contentions, High Point identified MGWs as integral switching system components. *See, e.g.*, J.A. 5859 ("The T-Mobile Network includes a plurality of switching systems . . . . T-Mobile's switching systems comprise one or more of the following components, either alone or in combination with one or more other such components: RNCs, MGWs, [Mobile Switching Centers] and/or components thereof.").

the date of the parties' cross-licensing agreement, J.A. 5395 (emphasis added); *see District Court Decision*, 53 F. Supp. 3d at 807 (stating that it was "difficult to hypothe-size a broader grant of a license" than the 1996 license AT&T granted to Alcatel). Although High Point argues on appeal that the 1996 cross-licensing agreement was intended to extend only to those future products which had the "same features or functionality" as products sold in 1996, Reply Br. of Plaintiff-Appellant at 15, it fails to identify anything in the text of the agreement or in the course of the parties' licensing negotiations to support this contention. To the contrary, given that the expansive cross-licensing agreement between AT&T and Alcatel was executed at a time of rapid technological evolution, we do not think that the parties intended to protect only those products that had the "same features or functionality" as those sold in 1996. Instead, the provision in the cross-licensing agreement identifying protected products uses "general, functional terms," *Rembrandt*, 641 F.3d at 1338, to cover not just the particular components sold in 1996 but any products of the same type or "kind."

C. Sales by Nokia Siemens Networks U.S.

In 1995, AT&T decided to split its business into three separate legal entities: (1) an equipment company; (2) a services company; and (3) a global information solutions provider. J.A. 4881. AT&T wanted to ensure that its existing patent rights were transferred to its three suc-cessor businesses. *See NXP Semiconductors USA, Inc. v. LSI Corp.*, No. C08-00775 JW, 2009 WL 1507333, at *2 (N.D. Cal. May 27, 2009) (explaining that "AT&T at-tempted to obtain consent from [its] licensors . . . to subli-cense AT&T's existing patent license rights to the three new AT&T entities"). Accordingly, it drafted a divestment rider to its 1988 cross-license with Siemens which provid-ed that its three new businesses would retain the "licens-es and rights" that AT&T itself possessed under that cross-license. J.A. 4881. Siemens was granted a corre-

sponding right to "retain the licenses and rights" that it possessed under the parties' cross-license. J.A. 4881. In addition, the divestment rider provided that if Siemens, or any of the three new AT&T entities, divested any "portion" of their businesses, the rights in the 1988 cross-license could be sublicensed to the future divested business. J.A. 4881. The divestment rider stipulated, however, that such sublicenses could "be granted and retained only while the future divested business operate[d] as a separately identifiable business and only to the extent applicable to products and services sold by the future divested business prior to its divestiture." J.A. 4881.

High Point contends that Siemens could not sublicense Nokia Siemens Networks B.V. because it did not qualify as a "separately identifiable business" under the terms of the 1995 divestment rider. We disagree. Nokia Siemens Networks B.V. was created in 2007 as a joint venture between a carrier division divested from Siemens and a networks business divested from Nokia. It was incorporated in the Netherlands as a private limited liability company. J.A. 5305. Nokia Siemens Networks B.V. was a separately operating company with its own board of directors and management structure. J.A. 6235. According to public documents from the relevant period, it began "independent operations" on April 1, 2007, and was afforded "autonomy to carry on its business independently" of either Siemens or Nokia. Because Nokia Siemens Networks B.V. operated as a legal entity separate from any other company, including Siemens and Nokia, it operated as a "separately identifiable business."

High Point asserts that to qualify as a separately identifiable business under the 1995 divestment rider, the carrier division that Siemens divested in 2007 had to operate separately not just from Nokia and Siemens, but from any third-party entity as well. In effect, High Point argues that the separately identifiable business limitation includes an unwritten, implicit prohibition against a

divested division operating as part of a joint venture with any third-party entity.

This argument fails for four reasons. First, AT&T was a large and sophisticated conglomerate, and if it had intended to prohibit a Siemens divested division from entering into a joint venture relationship with a third-party entity, it could have done so explicitly. Indeed, in November 1995—the same month that it executed the Siemens' divestment rider—AT&T entered into a divestiture agreement with N.V. Philips' Gloeilampenfabrieken, U.S. Philips Corporation, and North American Philips Corporation (collectively "Philips") which explicitly precluded a divested business from extending sublicense rights to a third-party entity. That agreement provided that the rights granted in the original license agreement between AT&T and Philips could be sublicensed:

> to any future divested present business of Philips or of the three [AT&T] entities by the divesting company. Such sublicenses may be granted and retained only while the future divested business operates as a separately identifiable business and *not for an existing or other acquired business of a third party acquiring the future divested business* and only to the extent applicable to those products and services sold by the future divested business which are substantially similar to products and services sold by it prior to its divestiture.

*NXP Semiconductors*, 2009 WL 1507333, at *2 (emphasis added).

Thus, in its divestiture agreement with Philips, AT&T explicitly provided that sublicenses could not be extended or retained in situations in which a third-party entity acquired a divested business. In marked contrast, however, AT&T included no such provision regarding third-party entities in its divestiture agreement with Siemens. Nor did AT&T include any provision specifying any par-

ticular corporate structure or form for a future divested business or any prohibition precluding a divested division from entering into a joint venture relationship. We decline, therefore, to substantively redraft the divestiture agreement between AT&T and Siemens to include such a prohibition.[3] *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1317 (Fed. Cir. 2005) (concluding that license protection extended to third parties where the licensor "could have drafted the license agreement to explicitly disallow" third-party rights but failed to do so).

Second, "[i]n the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties." *Alvin Ltd. v. U.S. Postal Serv.*, 816 F.2d 1562, 1565 (Fed. Cir. 1987) (citations and internal quotation marks omitted); *see United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) (Breyer, J., concurring) (emphasizing that "[u]nder ordinary principles of contract law," a court is bound to construe a contract "in terms of the parties' intent, as revealed by language and circumstance"). Here, the circumstances surrounding the drafting of the 1995 divestment rider strongly suggest that it was intended to grant broad license protection to the parties' future divested businesses. Significantly, the divestment rider was drafted by AT&T in preparation for its planned "trivestiture" of three separate businesses. *See* J.A. 4881. Given that AT&T itself was planning major divestments at the time it prepared and executed the 1995 divestment rider, it is only logical to assume that the rider was intended to

---

[3] At trial, counsel for T-Mobile explained that AT&T "could have put additional restrictions" in the 1995 divestment rider, but likely chose not to do so because it wanted to get the "reciprocal benefit[s]" from that divestment rider. J.A. 7507.

facilitate, rather than to impede, AT&T's complex restructuring efforts and to broadly shelter its future divested businesses from infringement liability going forward. Nothing in the divestiture agreement explicitly precludes a joint venture from receiving sublicense rights as a divested business, and High Point is unable to point to anything in the record indicating that the parties had any desire or incentive to curtail the rights of future divested businesses to enter into joint venture relationships with third-party entities.

Furthermore, while High Point challenges the district court's interpretation of the "separately identifiable business" limitation, it offers no reasonable alternative interpretation of that provision. High Point argues, without meaningful support, that the "self-evident purpose of the 'separately identifiable [business]' provision [was] to ensure that [a] divestment [did] not expand the scope of the original license to cover the products of unlicensed third parties." Reply Br. of Plaintiff-Appellant at 5. Even under High Point's proffered interpretation of the "separately identifiable business" limitation, however, "products of unlicensed third parties" are afforded license protection. For example, Siemens could have divested its carrier division and that division could have then acquired Nokia's infrastructure equipment product lines.[4]

---

[4]   Significantly, there is nothing to suggest that the joint venture between the divisions divested from Siemens and Nokia was a sham—lacking economic substance and entered into for the purpose of extending licensing protections to Nokia products. To the contrary, as a 2007 press release makes clear, Nokia Siemens Networks B.V. was a "50:50 joint venture" intended "to create an industry leader that [would] meet the needs of customers in the converging telecommunications industry." J.A. 5333. The new company was designed "to serve customers with a

In that scenario, the divested division would presumably remain a "separately identifiable business" notwithstanding the fact that it was selling Nokia product lines. We see nothing in the record suggesting that an entity qualifies as a "separately identifiable business" only if it does not sell third-party products. Indeed, it is highly unlikely that AT&T would have advocated for a divestiture agreement which imposed such restrictions on its own future divested divisions by prohibiting them from selling third-party product lines. Instead, while the 1995 divestment rider contains a significant limitation on the products that can be sold by a divested business—those products must be of the same "kind" that the divested business sold prior to its divestiture—it contains no preclusion of a divested business selling third-party product lines.[5]

Third, although High Point argues that Siemens could not validly sublicense Nokia Siemens Networks B.V. because it was not the "divested business," this argument proceeds from a misapprehension of the chronology of events leading to the formation of Nokia Siemens Networks B.V. Significantly, Siemens divested its carrier division *directly* into Nokia Siemens Networks B.V.

---

best-in-class portfolio" that "combined input of experts from Nokia and Siemens" and "harmonize[d] platforms to ensure cost-efficiency in ever-toughening markets." J.A. 5333.

[5] As the district court correctly concluded, the equipment sold to T-Mobile by Nokia Siemens Networks B.V. was the same "kind" of equipment that Siemens sold prior to the divestiture of its carrier division. *See District Court Decision*, 53 F. Supp. 3d at 809 n.13 (explaining that "Siemens was selling wireless infrastructure equipment (of which RNCs and Node Bs are a later generation type) long before the divestment of Siemens' carrier division").

Nokia Siemens Networks B.V. was thus created as the intended consequence of the Siemens divestment. *See* J.A. 6390–97. If Siemens wanted to provide licensing protection to its divested carrier division, the only entity that it could possibly sublicense was Nokia Siemens Networks B.V. To conclude that Siemens had no authority to sublicense Nokia Siemens Networks B.V. would be to eviscerate the provision in the 1995 divestment rider providing Siemens with explicit authority to sublicense any "portion" of its business it chose to divest. J.A. 4881.

Fourth, High Point provides no explanation as to why, from a business perspective, it would have mattered to AT&T whether the Siemens carrier division and the Nokia networks business were joined together in a single step rather than in multiple steps. Siemens could have simply divested its carrier division as a stand-alone business and then granted that business a sublicense. In that situation, nothing in the 1995 divestment rider suggests that the divested company would have forfeited its sublicense rights if it subsequently purchased Nokia's networks business and adopted "Nokia Siemens Networks B.V." as its new name. High Point offers no plausible basis for construing the "separately identifiable business" limitation in the divestment rider to preclude Siemens from sublicensing Nokia Siemens Networks B.V. simply because the two divested divisions were combined at the outset rather than sequentially.

Furthermore, while High Point complains that the Siemens carrier division did not remain "separately identifiable" within Nokia Siemens Networks B.V., it fails to explain why this is dispositive. For example, suppose the carrier division divested from Siemens had simply acquired the networks division divested from Nokia and then combined the two divisions' assets and operations. In that scenario, the resulting business would presumably qualify as a "separately identifiable business," notwithstanding the fact that the former Siemens division was

integrated with the former Nokia division. Alternatively, Siemens could have divested two of its own divisions into a new stand-alone entity, merging the two divested divisions' assets and operations. In that situation, High Point's unsupported interpretation of the separately identifiable business limitation would presumably mean that *neither* divested division could be sublicensed under the terms of the 1995 divestment rider because neither division would be "separately identifiable" from the other division.

D.  Sales by Ericsson U.S.

High Point also contends that the sales of Node Bs, RNCs, and MGWs to T-Mobile by Ericsson U.S. were unauthorized. It does not dispute that section 1.03(c) of the cross-licensing agreement between Lucent and LM Ericsson granted both parties the right to convey sublicenses to their subsidiaries. *See* J.A. 1781, 1793–94. Nor does it dispute that such sublicenses could be granted retroactively. *See* J.A. 1781. High Point contends, however, that the sublicense that LM Ericsson granted to its subsidiary, Ericsson U.S., was invalid because it was conveyed in January 2013, *see* J.A. 1797–99, and the terms of the asserted patents expired in July 2011.

We do not find this argument persuasive. The 1996 cross-licensing agreement between Lucent and LM Ericsson did not have a termination date. Furthermore, no provision in that agreement imposed any timing constraint on when LM Ericsson could convey sublicenses to its subsidiaries. To the contrary, section 1.03(c) of the agreement specifically provides that any sublicense LM Ericsson conveyed to a subsidiary could "be made effective retroactively." J.A. 1781.

In arguing that LM Ericsson had no right to grant retroactive sublicenses to its subsidiaries after the asserted patents expired in 2011, High Point relies primarily on section 1.02 of the cross-license, which provides that "[a]ll

licenses granted herein under any patent shall . . . continue for the entire unexpired term of such patent." J.A. 1781. Section 1.02, however, was plainly designed to shield a licensee, offering it immunity from infringement claims throughout the life of the licensed patents. High Point's proposed approach would twist section 1.02 like a pretzel, turning a provision intended to protect a licensee from infringement liability throughout the full terms of the licensed patents into a restriction on the licensee's explicit right, granted by section 1.03(c), to grant retroactive sublicenses to its subsidiaries. Contrary to High Point's assertions, there is nothing in section 1.02 to suggest that its timing provisions have any applicability to the sublicensing provisions of section 1.03(c). Indeed, section 1.02 does not mention retroactive sublicensing rights or refer in any way to section 1.03(c). *See* J.A. 1781.

Accepting High Point's contention that LM Ericsson's ability to grant sublicenses to its subsidiaries expired in July 2011 would lead to anomalous and inequitable results. In High Point's view, LM Ericsson had the right to sublicense the asserted patents to Ericsson U.S. until July 8, 2011, when the asserted patents expired, but forfeited that right the very next day. Such an approach would leave Ericsson U.S. vulnerable to infringement liability for up to six years after the patents' expiration date for sales occurring prior to that date. *See* 35 U.S.C. § 286 ("[N]o recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."). We do not think that LM Ericsson would have bargained for and obtained a cross-license which broadly granted it the right to convey retroactive sublicenses to its subsidiaries while at the same time agreeing to an implicit timing restriction which would have the effect of leaving those subsidiaries vulnerable to infringement liability for six years after the licensed patents expired. As T-

Mobile correctly notes, High Point's interpretation of section 1.03(c) "would have the perverse effect of encouraging delay in filing suit and providing more compensation [to the patent holder] after patent expiration than before." Br. of Defendants-Appellees at 47.

In *Kimble v. Marvel Entertainment, LLC*, the Supreme Court confirmed that a patent holder has no right to exact royalties for sales occurring after a patent's expiration date.[6] 135 S. Ct. 2401, 2407 (2015) ("[W]hen the patent expires, the patentee's prerogatives expire too, and the right to make or use the article, free from all restriction, passes to the public."). Significantly, however, the Court also made clear that although a patent holder is barred from obtaining royalties for post-expiration sales, this does not mean that all negotiated provisions in a licensing agreement necessarily cease to be effective after a licensed patent expires. *Id.* at 2408. As the Court explained, a licensing agreement could, for example, be structured in such a way that the licensor could continue to receive "payments for pre-expiration use of a patent into the post-expiration period." *Id.* Likewise, "[a] licensee could agree . . . to pay the licensor a sum equal to 10% of sales during the 20-year patent term, but to amortize that amount over 40 years." *Id.* We reject, therefore, High Point's argument that LM Ericsson's contractual right to grant retroactive sublicenses to its subsidiaries was extinguished when the licensed patents expired in July 2011.

We also reject High Point's assertion that the equipment sales by Ericsson U.S. were unauthorized because it had not yet been granted a formal written sublicense from

---

[6] Here, although LM Ericsson did not provide Ericsson U.S. with a written sublicense until 2013, the accused equipment sales occurred prior to the July 2011 expiration date of the asserted patents.

LM Ericsson at the time those sales occurred.[7]   "[T]he grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude."  *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009). Accordingly, "a patentee, by license or otherwise, cannot convey an affirmative right to practice a patented invention," but "can only convey a freedom from suit."  *Id.*; *see also U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1189 (Fed. Cir. 2005) (explaining that a license "simply provides the licensee with a guarantee that it will not be sued for engaging in conduct that would infringe the patent in question").   A product sale is therefore "authorized" when a patent holder surrenders his right to exclude—via a license agreement or covenant not to sue— and thereby immunizes the seller of that product from infringement liability.  *See TransCore*, 563 F.3d at 1275 (emphasizing that for exhaustion purposes, "authorization" turns not on how an agreement characterizes the rights afforded to a seller, but on whether that agreement ultimately shields the seller from an infringement claim); *see also Quanta*, 553 U.S. at 636 (concluding that exhaustion applied where the license agreement provided the licensee with the right to make and sell products "free of [the licensor's] patent claims").   Here, Ericsson U.S. was at all times authorized to sell the accused equipment to T-Mobile because when the sales took place neither Lucent nor any of its successor entities could have sustained an infringement claim based on those sales.  To the contrary, if they had attempted to bring suit, LM Ericsson had the unrestricted right, pursuant to section 1.03(c) of its cross-

---

[7]   Before the district court, Ericsson U.S. argued that although LM Ericsson did not provide it with a formal written sublicense until 2013, it was at all relevant times operating under a valid oral sublicense from its parent company.  *See* J.A. 7530.

licensing agreement with Lucent, to immediately grant Ericsson U.S. a sublicense, thereby immunizing Ericsson U.S. from any potential infringement liability.

E. Substantial Embodiment

Finally, we conclude that the district court correctly determined that licensed equipment substantially embodied all purportedly inventive elements in the asserted claims. *See District Court Decision*, 53 F. Supp. 3d at 810. "[M]aking a product that substantially embodies a patent is, for exhaustion purposes, no different from making the patented article itself." *Quanta*, 553 U.S. at 637; *see also United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942) (emphasizing that the authorized sale of an article which "embodies essential features of [a] patented invention" terminates a patent holder's rights in that article). When a patent holder authorizes the sale of a product that embodies a patent's inventive elements, he forfeits the right to exact royalties at subsequent points along the product's distribution chain. *See, e.g.*, *Univis*, 316 U.S. at 251 (emphasizing that "the patentee has received his reward for the use of his invention by the sale of the article").

Before the district court, High Point conceded that its right to assert infringement of claims 28, 29, and 31 of the '090 patent—which describe an individual "cell" within a radio-telephone communications system—was exhausted if the sales of Node Bs by Nokia Siemens Networks U.S. and Ericsson U.S. were authorized. *See District Court Decision*, 53 F. Supp. 3d at 809; *see also* J.A. 6194 n.14 ("High Point acknowledges that the accused Node Bs substantially embody the claimed inventions of [claims 28, 29, and 31], such that the licensed sale of a Node B would exhaust High Point's rights with respect to those patent claims."). As to the remaining asserted claims, T-Mobile persuasively established that, in view of High Point's own infringement contentions, the accused Node

Bs, RNCs, and MGWs substantially embodied every purportedly inventive element of the claimed inventions. J.A. 2724–814. Dr. Anthony Acampora, T-Mobile's expert, analyzed the asserted claims on a claim-by-claim basis, *see* J.A. 6050–98, and demonstrated that, according to High Point's infringement allegations, the accused Node Bs read on the cell-related elements in the asserted claims, *see, e.g.*, J.A. 1831, 1837, 1872–73, 1883, 1889–90, and the accused RNCs and MGWs read on the switching system elements of the asserted claims, *see, e.g.*, J.A. 1821–29, 1891–92, 1914.

On appeal, High Point argues that additional discovery might reveal that unlicensed routers and interconnect equipment in T-Mobile's system perform inventive features of the asserted claims. High Point notes that some asserted claims contain limitations that require transmitting and receiving packets in statistically multiplexed form, and argues that unlicensed routers and interconnect equipment could potentially be used to perform a "novel application of statistical multiplexing within a cellular voice telephone system architecture." Reply Br. of Plaintiff-Appellant at 26; *see* J.A. 6307 (declaration of High Point's expert, Richard A. Chandler).

In the Third Circuit, whose law governs our summary judgment review, "[s]peculation and conclusory allegations" are insufficient to defeat summary judgment. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasizing that a party seeking to avoid summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (explaining that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"). Despite being given ample opportunity to conduct discovery, High

Point failed to adduce any credible evidence that unlicensed routers or interconnect equipment performed any inventive feature of the asserted claims. "What is 'inventive' about patent claims in the patent exhaustion context is what distinguishes them from the prior art." *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1369 (Fed. Cir. 2013); *see also Quanta*, 553 U.S. at 633 (explaining that licensed products will substantially embody a patent when "the only step necessary to practice the patent is the application of common processes or the addition of standard parts"). Here, it is undisputed that statistical multiplexing was well-known in the art at the time of the claimed inventions, *see, e.g.*, J.A. 6060-61, 6211–14, and there is nothing in the record to even arguably suggest that unlicensed routers or interconnect equipment were used in the performance of any novel statistical multiplexing application.

## III. CONCLUSION

Accordingly, the judgment of the United States District Court for the District of New Jersey is affirmed.

**AFFIRMED**